FILED

1   Esperanza Cervantes Anderson | SBN 197953
2   **LAW OFFICE OF ESPERANZA CERVANTES ANDERSON**
    1037 North Allen Avenue
3   Pasadena, California 91104
    Tel.:  (626) 486-2477
4   Fax:   (626) 389-8911

    2014 SEP 23  PM 2:07

5   Attorney for Qui Tam Plaintiff Relator
    [Under Seal]

6

7

8               UNITED STATES DISTRICT COURT

9        FOR THE CENTRAL DISTRICT OF CALIFORNIA

10

11  [UNDER SEAL],                Case No. CV 14-7424-JAK (SHx)

12            Relator,           **COMPLAINT FOR VIOLATION
                                 OF THE FEDERAL FALSE
13       v.                      CLAIMS ACT**
                                 (31 U.S.C. §§ 3729 et seq.)
14  [UNDER SEAL],

15            Defendants.

16                               **JURY TRIAL DEMANDED**

17                               **(FILED IN CAMERA AND
                                 UNDER SEAL, AS REQUIRED
18                               BY 31 U.S.C. § 3730 (a)(2))**

19

20

21

22

23

24

25

26

27

28

- 1 -

Complaint for Damages / Demand For Jury

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

FILED

Esperanza Cervantes Anderson | SBN 197953
**LAW OFFICE OF ESPERANZA CERVANTES ANDERSON**
1037 North Allen Avenue
Pasadena, California 91104
Tel.:  (626) 486-2477
Fax:  (626) 389-8911

Attorney for Plaintiff Relator
RALPH TATGENHORST

2014 SEP 23  PM 2: 07

CLERK U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIF.
LOS ANGELES

BY _____

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA
ex rel. RALPH TATGENHORST, an
individual,

        Relator,

        v.

ITT CORPORATION, an Indiana
corporation; PEI/GENESIS, INC. a
Pennsylvania corporation; and DOES
1 through 20, inclusive,

        Defendants.

Case No. CV 14- 7424-JAK (SHH)

**COMPLAINT FOR VIOLATION
OF THE FEDERAL FALSE
CLAIMS ACT**
(31 U.S.C. §§ 3729 et seq.)

JURY TRIAL DEMANDED

**(FILED IN CAMERA AND
UNDER SEAL, AS REQUIRED
BY 31 U.S.C. § 3730 (a)(2))**

Plaintiff relator, Ralph Tatgenhorst, through his attorneys the Law Offices of
Esperanza Cervantes Anderson, on behalf of the United States of America for this
Complaint against Defendants ITT Corporation, PEI/Genesis Inc., and Does 1
through 20, alleges based on personal knowledge, relevant documents, and
information and belief, as follows:

## NATURE OF THE ACTION

1.    This is an action to recover damages and civil penalties on behalf of
the United States of America arising from false and/or fraudulent statements,
records, and claims made and caused to be made by Defendants and/or their

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

- 1 -

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

agents, and employees in violation of the Federal False Claims Act, 31 U.S.C. §§ 3729 et seq. ("FCA").☐The Complaint alleges that Defendants knowingly submitted, or caused to be submitted, claims for payment to the United States Government for high reliability electrical components that were not manufactured as required and/or screened as required and for which specialized manufacture and screening the government paid a premium, all in violation of 31 U.S.C. §§ 3729(a)(1) and (a)(2).

2.      The FCA was originally enacted during the Civil War to address fraud against the Government. Congress substantially amended the Act in 1986 to enhance the Government's ability to recover losses sustained as a result of fraud against the United States after finding that fraud in federal programs was pervasive and that the Act, which Congress characterized as the primary tool for combating Government fraud, was in need of modernization. Congress intended the amendments to create incentives for individuals with knowledge of fraud against the Government to disclose information without fear of reprisals or Government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the Government's behalf.

3.      The FCA provides that any person who presents or causes to be presented false or fraudulent claims for payment or approval to the United States Government, or knowingly makes, uses, causes to be made or used false records and statements to induce the United States to pay or prove false and fraudulent claims, is liable for a civil penalty of up to $11,000 for each such claim, plus three times the amount of damages sustained by the federal Government.

4.      The FCA allows any person having information about false or fraudulent claims to bring an action on behalf of the Government, and to share in any recovery. The FCA requires that the complaint be filed under seal for a minimum of 60 days (without service on the Defendants during that time) to enable the United States to: (a) conduct its own investigation without the Defendants'

- 2 -

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

knowledge, and (b) determine whether to join the action.

5.   Based on the FCA, *qui tam* plaintiff and relator Ralph Tatgenhorst seeks to recover all available damages, civil penalties, and other relief for the federal violations alleged herein.

## INTRODUCTION

6.   The United States Department Of Defense spends millions of dollars each year on electronic parts, such as microcircuits, resistors, connectors, and numerous other components. These electronic parts are incorporated into the navigation, internal measurement units and other systems for wide array of military equipment, including airplanes, missiles, helicopters, and submarines.  As such, the DOD requires that these components be manufactured in a specialized environment designed to ensure that the components will perform in the potentially more stringent conditions of military use.  While many of the component parts that are used in these systems are available commercially, commercial parts may not be manufactured appropriately to ensure consistent reliability, and they are not tested by their manufacturers to meet the potentially more stringent conditions of military use. Accordingly, Defendants' contracts require the Defendants to ensure that the component parts they use are manufactured and screened to validate that the parts will function appropriately in the more extreme environmental conditions to which military uses may subject them. The added labor, tooling, testing and other costs to meet these requirements are added to the price the Government pays for the component parts.

7.   Defendant ITT has manufactured billions of electronic connectors for use in the military and aerospace industries over a period of 80 years. The inset screen shot is taken from the cover of ITT's 2014 digital product catalog. (ITT Sourcebook, 2014.)



- 3 -

8.     From at least 2010 to 2014, Defendants knowingly submitted claims to the Government, or caused others to submit claims to the Government, for payment of high reliability electrical connectors that were not manufactured and/or screened as required. Defendants manufactured and distributed well over 25,000 individual component electrical connectors from and to other vendors. Of those 25,000 part numbers, the precise number of part numbers that were not manufactured appropriately and/or were not screened is unknown, but the number is substantial and the parts are incorporated into many different military systems and platforms. While a non–screened commercial part that is not manufactured in accordance with the military specifications may function appropriately in the military platform, the Government pays a premium to have the components manufactured in a controlled environment and pays for the cost of screening to ensure that part will perform. By failing to comply with the strict manufacture requirements and failing to perform the screening process, Defendants substantially overcharged the Government for parts.

## PARTIES

9.     Plaintiff/relator Ralph Tatgenhorst ("Relator") is an individual residing in the County of Los Angeles, State of California. Tatgenhorst, a military veteran, worked from December 2010 to June 2014 as a Regional Quality Manager at the Santa Ana, California facility for Interconnect Solutions, a division of ITT Corporation. Tatgenhorst managed a team of inspectors and quality engineers for Interconnect Solutions (historically known as ITT Cannon) engaged in the design and manufacture of engineered high performance, military-specification, and commercial electrical connectors to transfer signal and power. These devices are of various types, such as circular, rectangular, radio frequency, fiber optic, D-sub miniature, micro-miniature, and cable assemblies for applications in harsh environments.

- 4 -

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

10. Defendant ITT Corporation ("ITT") is and was a duly organized Indiana corporation, publicly traded under the stock ticker symbol "ITT," and principal place of business at 1133 Westchester Avenue, White Plains, NY 10604. ITT manufactures engineered critical components and customized technology solutions for the energy, transportation, and industrial markets in the United States and internationally. The company operates in four segments: Industrial Process, Motion Technologies, Interconnect Solutions, and Control Technologies. ITT reported gross profits of $799.8 million on revenues of nearly $2.5 billion to the Securities and Exchange Commission for 2013 (Annual Form 10-k), of which the Interconnect Solutions division accounted for nearly one-third (32.8%).

11. Defendant PEI/Genesis, Inc. ("PEI-Genesis") is and was a duly organized, privately held Pennsylvania corporation, with a principal place of business at 2180 Hornig Road, Philadelphia, PA 19116. PEI-Genesis is distributor for many branded electrical components serving the military and aerospace sectors globally, including provision of ITT's connectors. PEI-Genesis is the world's largest value-added distributor of ITT connectors and markets its capabilities as meeting and exceeding the highest military and industrial standards for consistent quality, inspection, marking and packaging.

12. Relator is ignorant of the true names and capacities, whether individual, corporate, or associate, of those defendants fictitiously sued as Does 1 through 20 inclusive and so Relator sues them by these fictitious names. Relator is informed and believes that each of the DOE defendants is in some manner responsible for the conduct alleged herein. Upon discovering the true names and capacities of these fictitiously named Defendants, Relator will amend this complaint to show the true names and capacities of these fictitiously named defendants.

13. Unless otherwise alleged in this complaint, Relator is informed, and on the basis of that information and belief alleges, that at all times herein

- 5 -

mentioned, each of the remaining codefendants, in doing the things hereinafter alleged, were acting within the course, scope, and under the authority of their agency, employment, or representative capacity, with the consent of her/his/its codefendants.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C.§3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730. The Complaint is not based upon allegations or transactions that have been publicly disclosed under 31 U.S.C. § 3730(e). In addition, the Relator has direct and independent knowledge of the information on which the allegations and transactions are based and voluntarily provided the information to the Government before filing this action.

15.     Personal jurisdiction and venue are proper in this judicial district pursuant to 28 U.S.C. §§ 139l(b) and 1395(a) and 31 U.S.C. § 3732(a), as the Defendants are found in, have or have had an agent or agents, have or have had contacts, and transact or have transacted business in this district.

16.     Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because defendants can be found in, and transact business in the Central District of California, the divisional headquarters for Interconnect Solutions, a division of ITT Corporation, is in this judicial district, and many of the violations of 31 U.S.C. § 3729 described herein occurred within this judicial district.

## ITT'S CULTURE OF NON-COMPLIANCE

17.     In March 2007, ITT pleaded guilty to violating the Arms Export Control Act. The guilty plea was related to ITT-Night Vision Division's violations involving illegal exports, reexports and retransfers of night vision technology. In a

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

December 2007 consent agreement between Directorate of Defense Trade Controls in the State Department and ITT, the parties agreed to a $100 million penalty and a nearly complete debarment of ITT-Night Vision Division.

18.     As part of the consent agreement, ITT agreed to implement extensive International Traffic in Arms Regulations (ITAR) compliance measures, including allocation of sufficient resources devoted to regulatory compliance, hiring of a special compliance official with unfettered access to records, documents and employees for a period of at least four years, six-month status reports to the Directorate of Defense Trade Controls on compliance, implementation of an ombudsman program, employee training programs, and retention of outside legal counsel to conduct an audit of compliance with the consent agreement. (Annex of Compliance Measures and Remedial Action Plan, Appendix A to Consent Agreement).

19.     In the February 22, 2010 Federal Register, the Directorate of Defense Trade Controls in the State Department announced it has terminated the ineligible status and statutory debarment of ITT Corporation's Night Vision Division, nevertheless, a culture of non-compliance persists today as alleged herein.

## DEFENDANTS' FRAUDULENT PRACTICES

### A.     High Reliability Industrial Parts

20.     Defendants sell products directly to the Government, or as a supplier to government contractors. Defendants incorporate into their products a number of standard commercial and industrial electronic component parts. These parts are used in commercial applications such as automotive, desktop computing, and telecommunications that have significantly lower testing requirements. Under Defendants' contracts with the Government, and with prime contractors for the Government these parts can be bought from the same sources used for commercial platforms, but must be subjected to an "up screening" testing process that will

- 7 -

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

demonstrate that these parts would meet the more extreme environmental conditions to which they will be subjected for military uses. The tests that must be performed to ensure that these parts can be relied upon are expensive to perform and monitor. Building the necessary tooling to perform the tests is also expensive. These costs are passed on to the government, which pays more for the parts that would pay for standard commercial or industrial electronic components. The cost of the tooling sometimes passed on in the cost part, and sometimes charged separately as a nonrecurring expense.

### B.   Counterfeit Electronics (MIL-DTL-38999)

*"We do not want a $12 million missile defense interceptor's reliability compromised by $2 counterfeit part"*

> General Patrick O'Reilly
> Director, Missile Defense Agency
> November 8, 2001

21.   In addition to the safety and national security risks they create, counterfeit electronic parts also drive up the cost of defense systems. The Committee On Armed Services, United States Senate recently observed "in September 2010 the Missile-Defense Agency (MDA) learned that mission computers for THAAD missiles contain suspect counterfeit memory devices. According to MDA, if the devices had failed, the THAAD missile itself would likely have failed." (*Inquiry into Counterfeit Electronic Part in the Department Of Defense Supply Chain*, 112th Congress, Second Session). The Committee's investigation found the problem of counterparts to be widespread in the defense supply chain.

22.   Electrical and signal connectors used by U.S. Department of Defense were originally developed in the 1930s for severe aeronautical and tactical service applications, and set the standard for modern military circular connectors. These connectors, and their evolutionary derivatives, are often called Military Standard, "MIL-STD", or (informally) "MIL-SPEC" connectors.

//

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

- 8 -

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

23.    United States Military Specification MIL-DTL-38999 specifies the requirements to which certain electrical connectors must conform. This includes various objective parameters, including measures of durability, insulation resistance, vibration, shock, altitude immersion, solvent immersion, corrosion and temperature durability. MIL-DTL-38999 expressly requires that the manufacturer shall establish and maintain a quality system that allows its parts that are covered by this specification. (MIL-DTL-38999, Section 3.2.1.) Further, MIL-DTL-38999 requires the manufacture to certify that its assembly plant is approved for the distribution of the parts, and uses only piece parts (i.e. subcomponents such as connector shells and inserts) produced by the qualified manufacturer. (MIL-DTL-38999, Section 4.2.1.1.)

24.    A manufacturer, such as ITT, has to undergo a rigorous application process in order to get the materials, processes or products it intends to sell to the government on the "qualified manufacturers list" and/or the "qualified products list."  This process requires ITT to demonstrate to the government that it has the capability to manufacture the product reliably and in compliance both with its own internal requirements and the military specifications.  Importantly, if a product, process or material is not on the Qualified Manufacturers Listing or Qualified Product Listing, it cannot be sold to the government.

25.    Widely-used in military, aerospace and space programs, MIL-DTL-38999 describes four series of miniature, high density, bayonet, threaded, or breech coupling, circular, environment resistant, electrical connectors using removable crimp or fixed hermetic solder contacts, and are capable of operation within a temperature range of -65 to +200 degrees Celsius. The connectors are intended for use as follows: (i) Series I connectors are used where a quick disconnect coupling system is required for blind mating or other mating problem areas, and these connectors provide high-vibration characteristics and are suitable for severe wind and moisture problem (SWAMP) areas with proper connector accessories; (ii)

- 9 -

Series II connectors are used where the connector is not subjected to high vibration or SWAMP areas; (iii) Series III connectors are suitable for blind mating areas, and provide high-vibration characteristics at elevated temperature and are suitable for SWAMP areas with the proper connector accessories; and (iv) Series IV connectors are used where a quick disconnect coupling system is required for blind mating or other mating problem areas, and these connectors provide high-vibration characteristics and are suitable for SWAMP areas with the proper connector accessories.

26.    ITT has manufactured the MIL-DTL-38999 connector series since the mid-1970s. ITT's MIL-DTL-38999 connector series are now in use in military vehicles, defense electronics, commercial and military aircraft, missiles, tactical communications, and avionics.

27.    For several years, ITT has knowingly allowed, and continues to allow, PEI-Genesis to procure components manufactured by other vendors of unknown provenance, to assemble and distribute ITT's MIL-DTL-38999 connector series as products falsely certified by ITT, resulting in the sale of counterfeit, noncompliant and non-verified electrical parts.

## C.    Failure To Report Product Test Failures

28.    The United States Department of Defense requires procurement of supplies that conform to established specifications for fulfillment of necessary hardware and equipment. After products or manufacturing processes are initially qualified, ("Qualified Products Listing") periodic requalification or retesting may be required, and an official of the manufacturer or supplier periodically must certify that no changes have occurred in a product's design or manufacture that would warrant requalification.

29.    In 2014, Tatgenhorst learned that the Defense Logistics Agency was under pressure by Lockheed Martin to pull ITT's status as a "Qualified Products Listing" status for all ITT's MIL-SPEC products.

- 10 -

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

30.    ITT's product evaluation lab was obligated under the applicable MIL-SPEC requirements to report test failures, but since 2010 ITT failed to report numerous test failures to the Defense Logistics Agency's Government-Industry Data Exchange Program ("GIDEP"). As of February 19, 2014, ITT had discovered 26 failures that were not reported to GIDEP. As a member of GIDEP, ITT was obligated to report "Failure Experience Data" that contains objective failure information, notifying users of ITT's nonconforming parts, components, processes, materials, and any safety hazards. Tatgenhorst learned that his compliance predecessor at ITT was aware of the requirement to immediately report the test failures to GIDEP, but instructed ITT to withhold the test data indicating ITT product failures.

**D.    ITT's Model Shop Violations**

31.    When Tatgenhorst began working at ITT in 2010, he took steps to ensure that ITT complied with AS9100. AS9100 is published by the Society of Automotive Engineers, an international association of engineering professionals in industries such as aerospace, automobile and commercial vehicle manufacturing. AS9100 is endorsed by the Federal Aviation Administration as the recognized quality standard for the aerospace industry. Major aerospace manufacturers and suppliers worldwide require compliance and/or registration to AS9100 as a condition of doing business with them.

32.    Moreover, as described above, only products, processes and materials that are on the qualified manufacturers listing or qualified products listing can be sold to the government. Although a facility may have several production lines, only the production lines only those production lines qualified can be used to manufacture products for use by the military.

33.    ITT's product development included design and development by engineers in-house to ITT. This process, known as the ITT "Model Shop" employed had no quality management system. The Model Shop was not designed

- 11 -

to ensure compliance with design specifications for any one product. As such, the Model Shop did not comply with the requirements of AS9100C. The production lines in the Model Shop were not on the qualified manufacturers listing or the qualified products listing.

34. Because model shops are intended to create models, prototypes and samples that the customer can review and edit, but not used in a final product, the Model Shop's lack of a formal quality management system or procedures was not a problem theoretically. Parts manufactured in the ITT Model Shop were not "certified" or shipped with a Certificate of Conformance because the Model Shop did not have the existing policies, procedures or quality guidelines in place to ensure that the products conformed to design specifications.

35. However, it became apparent to Tatgenhorst that ITT was routinely using the Model Shop to produce final products to fill customer orders that required a quick turn around. ITT was producing hundreds, and in some instances thousands, of components in the Model Shop.

36. Manufacturing in the Model Shop violated several military and/or customer specifications. This meant that ITT is in violation of required MIL-SPEC and aerospace standards, as well as ITT's contracts with ITT's purchasers. ITT was defrauding its customers, including the government, by failing to inform its customers that the products were being manufactured in the Model Shop. Indeed, any Certificates of Conformance issued at this time for products manufactured in the Model Shop were false because without the proper quality assurance and manufacturing methodology in place, ITT could not be certain that the products complied with applicable MIL-SPEC and aerospace standards, or contracts with ITT's purchaser's specifications.

37. In order to get around these problems, Ms. Tracey Peacock ("Peacock"), now former Vice President and Director of ITT, instructed Tatgenhorst to work with Mr. John Lopata, ITT Engineering Director North

- 12 -

Law Office of Esperanza Cervantes Anderson
Pasadena, California

America, to create the proper procedures to make manufacturing in the Model Shop compliant with AS9100C. Although the procedures and ISO compliance would take at least one month to put in place, Peacock wanted to allow the manufacturing to continue. Peacock suggested obtaining a waiver from a customer, which was impossible because the requirements in the MIL-SPECS cannot be waived.

38.    In any event, Tatgenhorst's effort to create polices, procedures and quality guidelines were soon halted because the director in charge of the ITT Model Shop, Mr. Peter Hyzin, refused any oversight. All attempts to make the ITT Model Shop compliant were halted, but ITT continued to manufacture in the ITT Model Shop. In June 2014, ITT filed a customer order with parts manufactured in the ITT Model Shop. This practice continues to this day.

**E.      False Certification**

39.    From December 2010 through June 9, 2014, Tatgenhorst worked at ITT as a Quality Manager. Tatgenhorst was responsible for ensuring that the products manufactured by ITT, or on ITT's behalf, complied with the specifications of ITT's customers. Tatgenhorst's job was, and continues to be, essential to the operation of ITT's business because the products manufactured by ITT are used in the manufacture of civilian aircraft (such as jets used to transport thousands of persons per day across the globe), military aircraft and other military products (such as radios). Any imperfection in ITT's products can cause the customer's products to malfunction, and can result in the death of the persons onboard the aircraft, or relying on the military products.

40.    During Tatgenhorst's employment, Tatgenhorst issued a certification with his signature only after Tatgenhorst was assured that ITT's products complied fully with the customer's specifications. Given the potential for catastrophe Tatgenhorst took his job very seriously. On several occasions, Tatgenhorst refused to issue the certification when he believed the ITT products failed.

- 13 -

41.     Tatgenhorst gave notice that he would be leaving ITT's employ on or about June 9, 2014. On or about June 2, 2014, Tatgenhorst sent e-mail to his superiors at ITT reminding them to that they were not allowed to use Tatgenhorst's name on ITT's certifications of compliance after June 9, 2014.

42.     Although Tatgenhorst provided such notice, Tatgenhorst is informed and believes and herein alleges that ITT has knowingly used Tatgenhorst's name on certifications on ITT's products following Tatgenhorst's termination, without the prior consent of Tatgenhorst, and despite his express instructions to the contrary.

43.     The use of the Tatgenhorst's name is, was, and continues to be for commercial purposes and for sale of products to the United States government. ITT cannot sell its products without a qualified person to sign the certifications. Upon information and belief, ITT did not replace the Quality Manager position with a U.S. Citizen until September 2014. ITT hired a U.S. Citizen for this position in September 2014 because a customer rejected products when it learned that the Certificates of Conformance had not been signed by a U.S. Citizen, as required by regulations under International Traffic in Arms Regulations. ("ITAR").

**F.      Sale Of Non-Conforming Parts**

44.     Although ITT hired Relator to act as the Quality Manager, and to identify whether products conformed or did not conform to a customer's or the government's specifications, ITT refused to accept Relator's judgment when he found that products were not conforming. In or about September 2012, Relator rejected certain product as non-conforming. Rather than scrapping the product, ITT shipped the non-conforming product to its facility in Japan for storage. Instead of keeping the non-conforming product there, ITT then shipped the non-conforming product to the customer. ITT did not disclose to the customer the deficiencies with the product.

//

- 14 -

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

### G.   Knowing Failure to Conform with Revisions to Mil Specs

45.   In or about June 2013, MIL-DTL 26482 was revised to require that hermetic connectors (which are designed for use in ground support equipment, weapon systems, communication systems, traffic controls, industrial automation, process controls, geophysical expiration) be tin plated with a minimum 3% lead. Although ITT was given three months to comply, as of June 2014, ITT had still not complied.  As of June 2014, ITT was still using pure 100% tin to plate its hermetic connectors.

### H.   Conclusion

46.   By failing to manufacture all components in accordance to specification, and failing to perform for screening as represented for its MIL-SPEC connectors and as required in its contracts with the Government and with prime contractors for the Government, the Defendants substantially overcharged, or caused others to overcharge, the Government for high reliability industrial parts. The Government pays a premium for the specialized manufacturing and screening, without which part is no different from a part that could be, and was, purchased commercially for a lower price.

47.   Defendants have been aware that the parts were either not manufactured appropriately or had not been screened as required since at least 2010, when they ceased to report to the Defense Logistics Agency the failures in product evaluation lab testing, and knowingly and openly allowed third-party vendors of unknown providence to provide counterfeit components for assembly, distribution and sale by PEI-Genesis. Despite being on notice of the parts are not manufactured or screened as required, defendants failed address the problem.

//
//
//
//

- 15 -

48.     The specific scomponent parts that defendants failed to manufacture appropriately or screen include, but are not limited to, the following ITT product lines:

a) **Mil-DTL-38999.** Connectors designed for use in high performance military aircraft, commercial airlines, communications equipment, armored personnel carriers and tanks, missiles, and shipboard. (*See* ¶¶ 23-26 *supra*)

b) **Mil-DTL-24308**   D-Subminiature hermetic connectors used in medical equipment, robotics, data transmission, and test equipment.

c) **Mil-DTL-83513**   Micro-D connectors used in satellites, missiles, robotics, commercial avionics, navigation systems, unmanned vehicles,  aerospace launch vehicles, and medical equipment.

d) **Mil-C-83733 (USAF)**    DPK series are high performance environment- resistant, rectangular connectors, designed for applications where environment or thermal protection is mandatory and high reliability is a requirement.

e) **Mil-DTL-26482**   Connectors designed for use in ground support equipment, weapon systems, communication systems, traffic controls, industrial automation, process controls, geophysical expiration.

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

**f) Mil-DTL-83723** Commercial, military and aerospace interconnect systems that demand hermetic sealing and high vibration resistance in a medium density cylindrical connector.

**g) Mil-DTL-32139** Nano Miniature NDD Series used in aerospace structures, satellite systems, defense electronics, and high temperature geophysical exploration.

49.    The specific purchase orders for these parts that reflect a requirement for screening are unknown but are believed to total in the hundreds of millions of dollars.

50.    The overcharges for the on-screen parts are reflected in the request for payment submitted under the defendants contracts for systems that incorporate the parts. Each invoice submitted under the contracts for the unscreened parts constitutes a false claim for payment.

51.    At the time of each shipment, defendants signing certificate of conformance attesting to compliance with contractual specifications. Each certificate of conformance constitutes a false statement supported a false claim for payment.

## FIRST CAUSE OF ACTION

### (False Claims Act 31. U.S.C. §§ 3729(a)(1) and (a)(2))

### (Against All Defendants)

52.    Tatgenhorst repeats and realleges each and every allegation contained in paragraphs 1 through X above as though fully set forth herein.

53.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended.

//

- 17 -

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

54.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to officers, employees or agents of the United States Government for payment or approval within the meaning of 31 U.S.C. § 3729(a)(l).

55.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false or fraudulent records and statements, and omitted material facts, to get false and fraudulent claims paid or approved, within the meaning of 31 U.S.C. § 3729(a)(2).

56.     The United States, unaware of the falsity of the records, statements and claims made or caused to be made by the Defendants, paid claims that would not have been paid but for Defendants' unlawful conduct.

57.     By reason of the Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

58.     Additionally, the United States is entitled to the maximum penalty of $11,000 for each and every violation of 31 U.S.C. § 3729 arising from Defendants' unlawful conduct as described herein.

## SECOND CAUSE OF ACTION
### (Civil Code Section 3344 - Against All Defendants)
### (Against ITT, Does 1-20)

59.     Tatgenhorst repeats and re-alleges the information set forth in Paragraphs 1 through 10 above and incorporates these paragraphs by reference into this cause of action as if they were fully alleged herein.

60.     ITT's, and Does1 through 20, and each of their, use of the Tatgenhorst's name has been, is and continues to be in violation of California Civil Code Section 3344.

//

- 18 -

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

61.    Tatgenhorst specifically informed ITT, and Does1 through 20, and each of them, that it did not have the right to use Tatgenhorst's name after his termination.    Notwithstanding Tatgenhorst's express notice that he would not consent to the use of his name after June 9, 2014, ITT, and Does 1 through 20, and each of them, has continued to use Tatgenhorst name on its certifications without Tatgenhorst's consent.

62.    At no time since June 9, 2014 did ITT, and Does1 through 20, and each of them, advise Tatgenhorst that it intended to, would, or in fact be using his name.

63.    The consent of Tatgenhorst was, and is, required for all such uses. Tatgenhorst is informed and believes and thereon alleges that ITT, and Does1 through 20, and each of them, began using Tatgenhorst's name on products that Tatgenhorst never saw or verified on or about June 10, 2014, and that ITT, and Does1 through 20, and each of them, used Tatgenhorst's name continually after June 10, 2014.

64.    ITT utilized Tatgenhorst's name throughout the State of California, and on information and belief throughout the entire United States, Canada, Latin America, Europe and Asia. When the totality of the ITT's use has been learned, Tatgenhorst will amend this Complaint to more particularly itemize the same.

65.    Tatgenhorst is entitled to compensation for the use of his name from June 10, 2014 until ITT, and Does1 through 20, and each of them, stops using his name.   Tatgenhorst is uncertain as to the amount of compensation to which he is entitled, and he will not be able to determine the same until he has learned the number of certificates on which Tatgenhorst's name appears, and total number of sales and profits earned by ITT from the use of Tatgenhorst's name.   At such time that the same is ascertained Tatgenhorst will amend his Complaint to more particularly itemize the same.

//

Complaint for Damages / Demand For Jury

66.   In addition, Tatgenhorst has suffered emotional distress, worry, and discomfort as a result of the ITT's, and Does1 through 20, and each of their, unauthorized use of his name.

67.   ITT's, and Does1 through 20, and each of their, unauthorized use of Tatgenhorst's name to certify that its products comply with ITT's, and Does1 through 20, and each of their, customers specifications continues to worry and upset Tatgenhorst.  Indeed, Tatgenhorst is aware the products he used to certify for ITT, and Does1 through 20, and each of them, were used in such vital products such as civilian and military aircraft and other military products. Any malfunction of a civilian plane during flight could endanger the lives of all of the passengers on board the airplane. Additionally, as a veteran, Tatgenhorst knows first hand that servicemen can get killed if the equipment they are relying on malfunctions in the field. With no person to take the risk of a non-compliant product – because the products are certified with Tatgenhorst's name – nothing is stopping ITT, and Does1 through 20, and each of them, from passing on any non-conforming products to its customers.

68.   The grossly reckless, and/or intentional, malicious, and bad faith manner in which ITT, and Does1 through 20, and each of them, engaged in those acts as described in this cause of action by willfully using Tatgenhorst's name without Tatgenhorst's authorization or consent entitles Tatgenhorst to punitive damages against ITT, and Does1 through 20, and each of them, in an amount within the jurisdiction of this court, to be ascertained by the fact finder, that is sufficiently high to punish ITT, and Does1 through 20, and each of them, deter them from engaging in such conduct again, and to make an example of them to others.

69.   Tatgenhorst has found it necessary to retain attorneys appearing herein to prosecute this action on his behalf and accordingly has become obligated to pay attorneys fees and costs relative to this proceeding, according to proof.

- 20 -

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

70.     In addition to the above damages, Tatgenhorst is entitled to recover from ITT, and Does 1 through 20, and each of them, the profits derived from the unauthorized uses of Tatgenhorst's name that are attributable to the use of Tatgenhorst's name.  Because customers will not accept ITT's, and Does1 through 20, and each of their, without the requisite certification – and ITT, and Does1 through 20, and each of them, all the profits of ITT's, and Does1 through 20, and each of their products using Tatgenhorst's name were derived from the unauthorized Use of Tatgenhorst's name.

71.     Tatgenhorst is uncertain of the amount of the sales of products with his certification from June 10, 2014 to the present, but believes that ITT, and Does1 through 20, and each of them, have millions of dollars in products.  The profits derived from these sales would be in amount within the jurisdiction of this court.  When the exact amount of profit has been ascertained, Tatgenhorst will amend this Complaint or to conform to proof.

## PRAYER

WHEREFORE, Relator prays judgment against ITT, PEI-Genesis and Does1 through 50, and each of them, as follows:

1.     That Defendants cease and desist from violating 31 U.S.C. § 3279 et seq.;

2.     That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants actions, plus a civil penalty of not less than $5,000 and not more than $11,000 for each violation of 31 U.S.C. § 3279;

3.     That the Relator be awarded the maximum amount allowed pursuant to §3730(d) of the False Claims Act;

4.     That Relator be awarded all costs of this action, including attorneys' fees and expenses;

Complaint for Damages / Demand For Jury

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

1       5.       That Relator recover all damages associated with use of Relator's

2   name according to proof;

3       6.       That Relator recover reasonable compensation for authorized use of

4   Relator's name according to proof;

5       7.       That Relator recover profits derived from use of Relator's name

6   according to proof;

7       8.       That Relator recover punitive damages from use of Relator's name

8   according to proof; and

9       9.       That Relator recover other and further relief as the court shall deem

10  appropriate.

11

12  DATED: September 23, 2014.     **LAW OFFICE OF ESPERANZA CERVANTES**

                      **ANDERSON**

13

14                        By:

15                        Esperanza Cervantes Anderson, Esq.

                      Attorney for Plaintiff/relator

16                        RALPH TATGENHORST

17

18

19

20

21

22

23

24

25

26

27

28

Complaint for Damages / Demand For Jury

LAW OFFICE OF ESPERANZA CERVANTES ANDERSON
PASADENA, CALIFORNIA

1

## DEMAND FOR TRIAL BY JURY

2      Pursuant to Rule 38 of the Federal Rules Of Civil Procedure, Relator hereby

3  demands a trial by jury.

4

5  DATED:  September 23, 2014.      **LAW OFFICE OF ESPERANZA CERVANTES**
                                    **ANDERSON**
6

7                                  By:

8                                  _____
                                   Esperanza Cervantes Anderson, Esq.
9                                  Attorney for Plaintiff/relator
                                   RALPH TATGENHORST

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 23 -

*ORIginal*

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

| I. (a) PLAINTIFFS ( Check box if you are representing yourself ☐ ) | DEFENDANTS ( Check box if you are representing yourself ☐ ) |
|---|---|
| UNITED STATES OF AMERICA ex rel. RALPH TATGENHORST | ITT CORPORATION; PEI/GENESIS, INC. |

| (b) County of Residence of First Listed Plaintiff _____ <br> *(EXCEPT IN U.S. PLAINTIFF CASES)* | County of Residence of First Listed Defendant **State of Indiana** <br> *(IN U.S. PLAINTIFF CASES ONLY)* |
|---|---|
| (c) Attorneys *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information. <br> LAW OFFICE OF ESPERANZA CERVANTES ANDERSON <br> Esperanza Cervantes Anderson I SBN 197953 <br> 1037 North Allen Avenue  Pasadena, California 91104 <br> Tel.: (626) 486-2477  Fax: (626) 389-8911 | Attorneys *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information. |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☒ 1. U.S. Government Plaintiff

☐ 2. U.S. Government Defendant

☐ 3. Federal Question (U.S. Government Not a Party)

☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding

☐ 2. Removed from State Court

☐ 3. Remanded from Appellate Court

☐ 4. Reinstated or Reopened

☐ 5. Transferred from Another District (Specify)

☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No     ☐ **MONEY DEMANDED IN COMPLAINT:** $ Subject to proof

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
False Claims Act
Qui tam claim for damages and penalties against defendants pursuant to 31 U.S.C. §§ 3729(a)(1) and (a)(2).

**VII. NATURE OF SUIT** (Place an X in one box only).

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☒ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | ☐ 190 Other Contract | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 195 Contract Product Liability | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 196 Franchise | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** | |
| ☐ 896 Arbitration | **REAL PROPERTY** | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| | ☐ 220 Foreclosure | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/ Accommodations | ☐ 740 Railway Labor Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| | | | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

| FOR OFFICE USE ONLY: | Case Number: |
|---|---|

CV-71 (06/14)                          CIVIL COVER SHEET                          Page 1 of 3

*CK4-7424*

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**VIII. VENUE:** Your answers to the questions below will determine the division of the Court to which this case will be initially assigned. This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| QUESTION A: Was this case removed from state court? | STATE CASE WAS PENDING IN THE COUNTY OF: | INITIAL DIVISION IN CACD IS: |
|---|---|---|
| ☐ Yes ☒ No  If "no," skip to Question B. If "yes," check the box to the right that applies, enter the corresponding division in response to Question E, below, and continue from there. | ☐ Los Angeles, Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | Eastern |

| QUESTION B: Is the United States, or one of its agencies or employees, a PLAINTIFF in this action? | B.1. Do 50% or more of the defendants who reside in the district reside in Orange Co.?  *check one of the boxes to the right* → | ☐ YES. Your case will initially be assigned to the Southern Division. Enter "Southern" in response to Question E, below, and continue from there. |
|---|---|---|
| ☒ Yes ☐ No | | ☒ NO. Continue to Question B.2. |
| If "no," skip to Question C. If "yes," answer Question B.1, at right. | B.2. Do 50% or more of the defendants who reside in the district reside in Riverside and/or San Bernardino Counties? (Consider the two counties together.)  *check one of the boxes to the right* → | ☐ YES. Your case will initially be assigned to the Eastern Division. Enter "Eastern" in response to Question E, below, and continue from there. |
| | | ☒ NO. Your case will initially be assigned to the Western Division. Enter "Western" in response to Question E, below, and continue from there. |

| QUESTION C: Is the United States, or one of its agencies or employees, a DEFENDANT in this action? | C.1. Do 50% or more of the plaintiffs who reside in the district reside in Orange Co.?  *check one of the boxes to the right* → | ☐ YES. Your case will initially be assigned to the Southern Division. Enter "Southern" in response to Question E, below, and continue from there. |
|---|---|---|
| ☐ Yes ☒ No | | ☒ NO. Continue to Question C.2. |
| If "no," skip to Question D. If "yes," answer Question C.1, at right. | C.2. Do 50% or more of the plaintiffs who reside in the district reside in Riverside and/or San Bernardino Counties? (Consider the two counties together.)  *check one of the boxes to the right* → | ☐ YES. Your case will initially be assigned to the Eastern Division. Enter "Eastern" in response to Question E, below, and continue from there. |
| | | ☒ NO. Your case will initially be assigned to the Western Division. Enter "Western" in response to Question E, below, and continue from there. |

| QUESTION D: Location of plaintiffs and defendants? | A. Orange County | B. Riverside or San Bernardino County | C. Los Angeles, Ventura, Santa Barbara, or San Luis Obispo County |
|---|---|---|---|
| Indicate the location(s) in which 50% or more of *plaintiffs who reside in this district* reside. (Check up to two boxes, or leave blank if none of these choices apply.) | ☐ | ☐ | ☒ |
| Indicate the location(s) in which 50% or more of *defendants who reside in this district* reside. (Check up to two boxes, or leave blank if none of these choices apply.) | ☐ | ☐ | ☐ |

| D.1. Is there at least one answer in Column A? | D.2. Is there at least one answer in Column B? |
|---|---|
| ☐ Yes ☒ No | ☐ Yes ☒ No |
| If "yes," your case will initially be assigned to the  SOUTHERN DIVISION.  Enter "Southern" in response to Question E, below, and continue from there.  If "no," go to question D2 to the right. → | If "yes," your case will initially be assigned to the  EASTERN DIVISION.  Enter "Eastern" in response to Question E, below.  If "no," your case will be assigned to the WESTERN DIVISION.  Enter "Western" in response to Question E, below.  ↓ |

| QUESTION E: Initial Division? | INITIAL DIVISION IN CACD |
|---|---|
| Enter the initial division determined by Question A, B, C, or D above: → | WESTERN |

| QUESTION F: Northern Counties? | | |
|---|---|---|
| Do 50% or more of plaintiffs or defendants in this district reside in Ventura, Santa Barbara, or San Luis Obispo counties? | ☐ Yes | ☒ No |

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**IX(a). IDENTICAL CASES**: Has this action been previously filed **in this court**?                    ☒ NO          ☐ YES

    If yes, list case number(s): _____

**IX(b). RELATED CASES**: Is this case related (as defined below) to any cases previously filed **in this court**?     ☒ NO          ☐ YES

    If yes, list case number(s): _____

Civil cases are related when they:

☐ A. Arise from the same or closely related transactions, happening, or event;

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges.

Check all boxes that apply. That cases may involve the same patent, trademark, or copyright is not, in itself, sufficient to deem cases related.

**X. SIGNATURE OF ATTORNEY**
**(OR SELF-REPRESENTED LITIGANT):** _____          DATE: September 23, 2014

**Notice to Counsel/Parties:** The submission of this Civil Cover Sheet is required by Local Rule 3-1. This Form CV-71 and the information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. For more detailed instructions, see separate instruction sheet (CV-071A).

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |